[Cite as *State v. Troutman*, 2012-Ohio-407.]

IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
MARION COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                     CASE NO. 9-11-17

    v.

TORRECE D. TROUTMAN,                O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Marion County Common Pleas Court
Trial Court No. 10-CR-495

Judgment Reversed and Cause Remanded

Date of Decision: February 6, 2012

APPEARANCES:

    *J. C. Ratliff, Jon L. Jensen, Jeff Ratliff and Ashley Lawson*
    **for Appellant**

    *Brent W. Yager* **for Appellee**

**SHAW, J.**

{¶1} Defendant-appellant, Torrece Troutman ("Troutman"), appeals the April 14, 2011 judgment of the Common Pleas Court of Marion County, Ohio, sentencing him to an aggregate sentence of seven months imprisonment for possession of cocaine in violation of R.C. 2925.11(A), (C)(4), a fifth degree felony, and possession of drugs in violation of R.C. 2925.11(A), (C)(2), a second degree misdemeanor.

{¶2} The facts relevant to this appeal are as follows. Shortly before 1:00 a.m., on October 2, 2010, Trooper Tawana Long of the Ohio State Highway Patrol witnessed Troutman drive his vehicle left of the center line on Delaware Avenue in Marion, Ohio. Trooper Long then activated her cruiser camera and stopped Troutman. Troutman stopped his vehicle in the parking lot of a Speedway gas station, and Trooper Long approached him. As Trooper Long approached the vehicle, Troutman handed his driver's license to her. She informed Troutman of the reason that he was stopped and asked for his registration and proof of insurance. Troutman complied with her requests.

{¶3} While speaking with Troutman, the trooper asked if he had anything illegal inside his vehicle, and he answered that he did not. He also questioned her motive for asking this question, stating that "not every black man carries drugs and guns." Trooper Long told him that these were standard questions that she asks

everyone, including "white people," and told him to look at her skin because she was also black.

{¶4} During this time, Trooper Long noticed that Troutman's eyes appeared to be bloodshot so she had him step out of the vehicle. Once Troutman was outside of his vehicle, Trooper Long patted him down for weapons and noticed that his pocket had a large bulge. When she asked what the bulge was, Troutman responded that it was money. Trooper Long then had him remove the money from his pocket. She asked him how much money he had, given the size of the bulge, and Troutman answered that he had $3,000.00. Trooper Long also asked him where he got this money. When he told her that he earned it from working, she asked him where he worked, and Troutman answered that he renovates houses.

{¶5} Trooper Long told Troutman to come with her so that she could administer a test of his eyes to determine whether he was able to drive. She led Troutman to the side of her patrol car and conducted a horizontal gaze nystagmus test to ascertain whether he was under the influence of alcohol and an additional nystagmus test to determine whether he was under the influence of marijuana. These tests revealed no indicators of alcohol or drug impairment.

{¶6} Immediately after administering these tests, Trooper Long placed Troutman in the rear seat of her patrol car and began checking his driver's license

information through a dispatcher. She also requested that a canine unit be sent to her location. Trooper Long asked Troutman various questions about whether the information on his license was accurate, e.g. his address, and he answered her. The dispatcher advised Trooper Long that Troutman's license was valid but that he had a prior drug conviction. Trooper Long again questioned Troutman about whether he had anything illegal in his vehicle. At this point, Troutman told her that he did not have anything illegal and that she could search his vehicle, and she advised him that she had a canine unit en route to search his vehicle.

{¶7} Shortly after this exchange, a back-up officer from the local police department arrived. This officer began asking Trooper Long about Troutman and advised her that he knew Troutman and that Troutman was a drug dealer. Over the next several minutes, Trooper Long repeatedly opened the door to the cruiser and questioned Troutman about whether he had anything illegal in his vehicle and informed him that she was only asking because she had a canine unit on the way. Troutman denied having anything illegal and again told the trooper that not all black men carry guns and drugs. He also told her a few more times that she could search his vehicle, including running the dog around the vehicle, and she stated that she was waiting for the canine unit.

{¶8} While waiting for the canine unit to arrive, Trooper Long again asked Troutman if he had anything illegal in his vehicle and also asked if he had

anything in the lining of his jacket. He told her that he did not and asked her whether she was going to write him a ticket. She again told him that she had someone coming with a canine. At this point, Troutman asked if she would proceed with writing him a ticket, and Trooper Long repeated that she was waiting for the canine unit. Troutman then informed her that he did not understand why he was being held in the back of the patrol car, revoked his consent for her to search his vehicle, and asked if he could return to his vehicle, if he could get his cigarettes from the vehicle, and if he could talk to his girlfriend on the phone instead of sitting in the patrol car. Trooper Long did not permit Troutman to leave the rear seat of her patrol car, and she shut the door of the patrol car.

{¶9} Soon thereafter, Trooper Long received a message from dispatch regarding the canine unit's location, and she opened the patrol car door to tell Troutman that it would be just a few minutes. Once again, Troutman asked why he was being detained because he did not understand Trooper Long's actions once she checked his license, which was valid, and learned that there were no warrants for his arrest. He also advised her that he knew a little bit about the law and questioned the legality of his detention. She told him that this was standard procedure, that she did not need his permission for a dog sniff, and to "chill out" for a few minutes and she would release him once the canine sniffed his vehicle.

{¶10} At some point, she also asked him why he was nervous, "acting so paranoid," and had his hands balled. He told her that he was not nervous or paranoid and that he simply had his hands positioned that way for no particular reason. He then reminded her that he told her she could search his vehicle but that he was refusing to give her permission to search it now because of how she was acting towards him.

{¶11} A few minutes after this last exchange, the canine unit arrived. Eight minutes after Troutman revoked his consent to search his vehicle, the police dog began to sniff the exterior of Troutman's vehicle. The dog alerted to the presence of drugs in the vehicle, and a search was conducted, revealing what appeared to be cocaine. After the vehicle was searched, Troutman was *Mirandized*, informed he was under arrest, was removed from the patrol car, and searched. During the search of Troutman's person, Trooper Long looked in the back seat of the patrol car where Troutman had been sitting and found a number of pills in the back seat. Troutman denied they were his, and Trooper Long informed him that nothing was in the back seat of her patrol car prior to Troutman being placed there.

{¶12} On October 14, 2010, Troutman was indicted for one count of possession of cocaine, a felony of the fifth degree, and one count of possession of drugs, a misdemeanor of the third degree. In addition, the indictment contained a

forfeiture specification as to Count One for the $3,209.00 that was confiscated from Troutman that night. Troutman entered pleas of not guilty on both counts.

{¶13} Counsel for Troutman filed a motion to suppress, which was heard on December 13, 2010. The trial court took the matter under advisement and subsequently overruled the motion on January 14, 2011. A supplemental indictment was filed on March 16, 2011, which added one count of possession of drugs, a misdemeanor of the second degree, and one count of tampering with evidence, a felony of the third degree. Troutman also pled not guilty to these additional counts.

{¶14} On March 29, 2011, Troutman withdrew his previously tendered pleas of not guilty on the fifth degree felony count of possession of cocaine and the second degree misdemeanor count of possession of drugs and entered pleas of no contest to both of these counts. In exchange, the State dismissed the remaining two counts and the forfeiture specification. Troutman was sentenced to an aggregate term of seven months in prison on April 14, 2011, but his bond was continued and his sentence stayed pending an appeal. This appeal followed, and Troutman now asserts one assignment of error for our review.

> **THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS THE EVIDENCE (1) WHEN THE STOP OF APPELLANT WAS CLEARLY A PRETEXTUAL STOP, (2) WHEN THE STOP EXCEEDED SCOPE AND DURATION, AND (3) WHEN APPELLANT'S ARREST WAS**

**NOT SUPPORTED BY REASONABLE SUSPICION OR PROBABLE CAUSE JUSTIFYING SUPPRESSION OF THE EVIDENCE AS FRUIT OF THE POISONOUS TREE.**

{¶15} Initially, we note that appellate review of a decision on a motion to suppress evidence presents a mixed question of law and fact. *State v. Bressler*, 3d Dist. No. 15-05-13, 2006-Ohio-611. At a suppression hearing, the trial court assumes the role of trier of fact and is in the best position to resolve factual questions and evaluate the credibility of witnesses. *State v. Carter*, 72 Ohio St.3d 545, 552, 651 N.E.2d 965 (1995). When reviewing a trial court's decision on a motion to suppress, an appellate court must uphold the trial court's findings of fact if they are supported by competent, credible evidence. *State v. Dunlap*, 73 Ohio St.3d 308, 314, 652 N.E.2d 988 (1995). We must defer to "the trial court's findings of fact and rely on its ability to evaluate the credibility of the witnesses," and then independently review whether the trial court applied the correct legal standard. *State v. Anderson*, 100 Ohio App.3d 688, 691, 654 N.E.2d 1034 (4th Dist. 1995).

{¶16} The United States Supreme Court has previously held that "[t]he Fourth Amendment [of the United States Constitution] provides that 'the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated * * *.' This inestimable right of personal security belongs as much to the citizen on the streets of our cities

as to the homeowner closeted in his study to dispose of his secret affairs." (Emphasis added.) *Terry v. Ohio*, 392 U.S. 1, 8-9, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Similar protection exists pursuant to Section 14, Article I of the Ohio Constitution. *See State v. Wilson*, 3d Dist. No. 5-07-47, 2008-Ohio-2742, ¶ 16. When evidence is obtained as a result of an unlawful search and seizure, it must be suppressed. *Id.*, citing *Mapp v. Ohio*, 367 U.S. 643, 649, 81 S.Ct. 1684, 6 L.Ed.2d 1081(1961).

{¶17} Troutman first asserts that the trial court erred by failing to suppress the evidence obtained during the search of his vehicle because Trooper Long had neither reasonable articulable suspicion of criminal activity or probable cause to believe a traffic violation occurred. More specifically, he maintains that the trial court erred in finding Trooper Long's testimony that she witnessed Troutman cross over the center line prior to activating her cruiser camera credible.

{¶18} The Ohio Supreme Court has held that "[w]here a police officer stops a vehicle based on probable cause that a traffic violation has occurred or was occurring, the stop is not unreasonable under the Fourth Amendment to the United States Constitution even if the officer had some ulterior motive for making the stop * * *." *City of Dayton v. Erickson*, 76 Ohio St.3d 3, syllabus, 665 N.E.2d 1091 (1996), following *United States v. Ferguson*, 8 F.3d 385 (6th Cir. 1993).

{¶19} Trooper Long testified that she witnessed Troutman travel left of the center line, a violation R.C. 4511.33, that she began following him, and that she activated her cruiser camera after witnessing this violation. As noted, a stop is not unreasonable when it is based upon probable cause that a traffic violation has occurred. Although the recording does not show this violation, this does not negate Trooper Long's testimony that she witnessed a traffic violation prior to activating her cruiser camera. The trial court was well within its discretion to believe her testimony that a traffic violation occurred before the recording was begun and to find that Trooper Long had probable cause to stop Troutman based on this violation, regardless of whether Trooper Long also had some ulterior motive for making the stop. Thus, we find Troutman's assertion to the contrary to be without merit.

{¶20} Troutman next contends that the length of the stop exceeded the scope and duration necessary to investigate and to cite him for the traffic violation. In response, the State maintains that the length of the stop did not exceed the amount of time Trooper Long routinely required to conduct a traffic stop and to issue a citation. The State further asserts that even if the duration of the stop exceeded the duration and scope of the initial reason for the stop, i.e. the traffic violation, Trooper Long had a reasonable articulable suspicion that Troutman was engaged in criminal activity that would justify his continued detention.

**{¶21}** The United States Supreme Court has held that "a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005), citing *United States v. Jacobsen*, 466 U.S. 109, 124, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984). For instance, "a seizure that is justified solely by the interest in issuing a * * * ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Caballes*, *supra*.

**{¶22}** More specifically, when conducting a stop of a motor vehicle for a traffic violation, an "officer may detain an automobile for a time sufficient to investigate the reasonable, articulable suspicion for which the vehicle was initially stopped." *State v. Smith*, 117 Ohio App.3d 278, 285, 690 N.E.2d 567 (1st Dist. 1996). However, the duration of the stop "is limited to 'effectuate the purpose for which the initial stop was made.'" *Id.*, quoting *State v. Venham*, 96 Ohio App.3d 649, 655, 645 N.E.2d 831 (4th Dist. 1994), citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *State v. Chatton*, 11 Ohio St.3d 59, 63, 463 N.E.2d 1237 (1994). "Thus, when detaining a motorist for a traffic violation, an officer may delay the motorist for a time period sufficient to issue a ticket or a warning." *Smith*, 117 Ohio App.3d at 285, 690 N.E.2d 567, citing *State v. Keathley*, 55 Ohio App.3d 130, 562 N.E.2d 932 (2d Dist. 1998).

-11-

This time period also includes the period of time sufficient to run a computer check on the driver's license, registration, and vehicle plates. *See Delaware v. Prouse*, 440 U.S. 648, 659, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). "'In determining if an officer completed these tasks within a reasonable length of time, the court must evaluate the duration of the stop in light of the totality of the circumstances and consider whether the officer diligently conducted the investigation.'" *State v. Batchili*, 113 Ohio St.3d 403, 2007-Ohio-2204, 865 N.E.2d 1282, ¶ 12, quoting *State v. Carlso*, 102 Ohio App.3d 585, 598-99, 657 N.E.2d 591 (9th Dist. 1995).

**{¶23}** In addition, a lawfully detained vehicle may be subjected to a canine sniff of the vehicle's exterior even without the presence of a reasonable suspicion of drug-related activity. *Caballes*, *supra,* at 409, 125 S.Ct. 834; *State v. Chambers*, 3d Dist. No. 5-10-29, 2011-Ohio-1305. While a dog sniff of a vehicle is constitutionally permissible when conducted during a lawful seizure of a person, if a dog sniff of a vehicle occurs during an unreasonably prolonged traffic stop where the driver is unlawfully detained, such results will be suppressed. *See Caballes*, supra, at 409, 125 S.Ct. 834.

**{¶24}** The detention of a stopped driver may continue beyond the time frame necessary to conduct the stop for purposes of the traffic violation when "additional facts are encountered that give rise to a reasonable, articulable

-12-

suspicion [of criminal activity] beyond that which prompted the initial stop [.]" *Smith*, *supra*, at 285, 690 N.E.2d 567, citing *State v. Myers*, 63 Ohio App.3d 765, 771, 580 N.E.2d 61 (1990); *Venham* , *supra,* at 655, 645 N.E.2d 831.  Reasonable articulable suspicion exists when there are "'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion.'"  *State v. Stephenson*, 3d Dist. No. 14-04-08, 2004-Ohio-5102, ¶ 16, quoting *State v. Bobo*, 37 Ohio St.3d 177, 178, 524 N.E.2d 489 (1988).

{¶25} In forming reasonable articulable suspicion, law enforcement officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'"  *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002), quoting *United States v. Cortez*, 449 U.S. 411, 417-418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).  Thus, determining whether the officer's actions were justified depends upon the totality of the circumstances, which must "be viewed through the eyes of the reasonable and prudent police officer on the scene who must react to the events as they unfold." *State v. Andrews*, 57 Ohio St.3d 86, 87, 565 N.E.2d 1271 (1991) (citations omitted).

{¶26} The touchstone of any Fourth Amendment analysis

> **"is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security,'" *Mimms*, 434 U.S., at 108–109, 98 S.Ct. at 332 (quoting *Terry v. Ohio*, 392 U.S. 1, 19, 88 S.Ct. 1868, 1878–1879, 20 L.Ed.2d 889 (1968)), and that reasonableness "depends 'on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers,'" *Mimms*, 434 U.S. at 109, 98 S.Ct. at 332 (quoting *United States v. Brignoni -Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 2579, 45 L.Ed.2d 607 (1975)).**

*Maryland v. Wilson*, 519 U.S. 408, 411, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997). When trying to prove an exception to the Fourth Amendment's warrant requirement exists, the State bears the burden of proof in order to survive a motion to suppress. *State v. Kessler*, 53 Ohio St.2d 204, 207, 373 N.E.2d 1252 (1978).

{¶27} Here, as we previously discussed, Troutman was lawfully detained for a traffic violation. Upon first approaching Troutman's vehicle, Trooper Long began speaking to him about the reason for the stop and asking for the documents necessary for the investigation of the stop. During this initial contact, Trooper Long noticed that Troutman's eyes appeared to be bloodshot. Concerned that he was under the influence of drugs or alcohol, Trooper Long had him exit the vehicle so that she could administer the HGN test.

{¶28} Prior to administering the test, she patted him down for weapons and noticed that his front pockets had large bulges. When she asked what was in his pockets, he replied that it was money, totaling approximately $3,000.00.

-14-

Troutman also had two cell phones. After having him remove the money from his pockets and asking him where he had gotten such a large amount of cash, she then proceeded to have him step to her patrol car to administer the HGN. After administering the HGN, as well as a separate nystagmus test, Trooper Long concluded that Troutman did not appear to be under the influence of any alcohol and/or drugs.

{¶29} She then placed Troutman in the back seat of the patrol car and proceeded to check his license and vehicle information. During this time, she also asked him questions regarding whether the information on his license was current and requested that a canine unit be sent to her location. This request for a canine unit occurred approximately seven minutes into the stop.

{¶30} Throughout this time, Trooper Long asked Troutman numerous times whether there was anything illegal in the car, if he had anything illegal on his person, and whether he was "100% sure" about his answers. When asked by Troutman why she repeatedly asked him these questions, she informed him that she had requested a canine unit be sent to their location. At this point, Troutman told her that she could search his vehicle.

{¶31} Within a few seconds of Troutman giving Trooper Long consent to search the vehicle, a back-up officer arrived on scene. Trooper Long, who was now out of her patrol car and had received the information she sought from

dispatch regarding the validity of Troutman's license and registration, began speaking with the back-up officer about Troutman. This officer informed Trooper Long that he recognized Troutman and that Troutman was a drug dealer.[1]

{¶32} For the next couple of minutes, Trooper Long repeatedly opened the patrol car door and questioned Troutman about whether he was being honest with her regarding whether he had anything illegal in his vehicle. Troutman again told her that he had nothing illegal in the vehicle, repeated that not every black person uses drugs, and told her, "Go ahead. Search my car." She once again informed him that she had a canine on the way, and Troutman replied, "You can run him around. You can search it. * * * There's nothing in there." This last exchange occurred approximately eleven and a half minutes into the stop.

{¶33} Twelve minutes and forty-seven seconds into the stop, after Trooper Long repeatedly opened the patrol car door and questioned Troutman about whether he had anything illegal in his vehicle, after Troutman had given her consent to search the vehicle at least three times, and after Trooper Long had received all the information she sought regarding Troutman's license, vehicle registration, and insurance, Troutman informed Trooper Long that he no longer had his consent to search the vehicle. He then questioned her about why she was keeping him in the back seat of the patrol car because she had checked his license

---

[1] This officer did not testify at the suppression hearing, and there was no evidence presented to explain how the officer knew this about Troutman.

and vehicle information and discovered that he was valid and had no warrants. Trooper Long then told him to "chill out for a minute," and when he told her that he did not want to be in the patrol car and asked if he could return to his vehicle, she again told him to "chill out."

{¶34} Nearly two minutes after Trooper Long told Troutman to "chill out," she again opened the car door and told him that the canine would be there in a minute. Troutman asked her about having to stay in the patrol car, questioned his continued detention, and asked if he could retrieve his cigarettes from the vehicle but was told again to "chill out." He again questioned why he was being detained given the fact that he was not under the influence of alcohol or drugs and had a valid license. He also told her that she did not have the right to search his car and that he had given her permission to search his vehicle but she did not search his vehicle and, instead, kept asking him questions. Trooper Long then closed the door to the patrol car.

{¶35} Approximately three and a half minutes later, the canine arrived. The canine officer asked Trooper Long for some information about the situation before running the dog around the car. Twenty minutes and forty seconds after Troutman was stopped by Trooper Long and nearly eight minutes after Troutman revoked his consent to search his vehicle and was still in the locked patrol car, the

canine began sniffing the exterior of Troutman's vehicle and alerted to the odor of drugs.

{¶36} Notably, throughout the time that Troutman was in the back of the patrol car, including after Trooper Long had received the information regarding Troutman's license, registration, insurance, and lack of warrants and after Troutman had repeatedly given Trooper Long consent to search his vehicle, she never began to actually write the traffic ticket or to personally search his vehicle or have the other officer search it. She simply waited around for the canine to arrive and *repeatedly* questioned Troutman about whether he had anything illegal in his vehicle or on his person. Under the totality of these circumstances, we cannot conclude that Trooper Long diligently conducted her investigation into the reason for the initial stop of the vehicle, i.e. the marked lanes violation.

{¶37} Nevertheless, the State maintains that the continued detention was proper because Trooper Long encountered additional facts that gave rise to a reasonable articulable suspicion of criminal activity beyond that which prompted the initial stop. These facts are the time of night (12:47 a.m.) and that Troutman had two cell phones, a large amount of money, was turning towards his vehicle when Trooper Long was attempting to have him step over to her patrol car to administer the HGN test, was argumentative, and had a prior drug conviction

**{¶38}** In assessing whether a detention is too long in duration to be justified as an investigative stop, the United States Supreme Court has held that a court should

> **examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant. * * * A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing. * * * A creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished. But "[t]he fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, itself, render the search unreasonable."** *Cady v. Dombrowski*, **413 U.S. 433, 447, 93 S.Ct. 2523, 2531, 37 L.Ed.2d 706 (1973). The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it.**

*United States v. Sharpe*, 470 U.S. 675, 686-687, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985) (internal citations omitted).

**{¶39}** Here, the trooper testified that in her eight years of experience, that Troutman's argumentativeness and turning towards his vehicle along with the large amount of money and two cell phones, at such a late hour given his prior drug conviction were indicative of criminal activity. The trial court found that based upon the totality of these circumstances, Trooper Long had a reasonable

articulable suspicion to continue this traffic stop beyond the normal amount of time it took to for the traffic citation to be investigated and issue.

{¶40} While Trooper Long may very well have had a reasonable articularble suspicion of criminal activity that would justify the continuation of the traffic stop, the more important question is whether Trooper Long diligently pursued a means of investigation that was likely to confirm or dispel her suspicions quickly and whether she acted unreasonably in failing to recognize or pursue an alternative means. *Id.*; see also, *Batchili*, *supra,* at ¶ 12.

{¶41} Unquestionably, Trooper Long was given permission by Troutman to search his vehicle. He was locked in the back of her patrol car, yet she chose, for reasons not articulated in the record, to not search it and wait for the canine. Even after a back-up officer arrived and Troutman gave her permission to search his vehicle once again, Trooper Long did not search his vehicle or have the other officer do so. Further, during the four minutes that she had Troutman's permission to search, Trooper Long chose not to search the vehicle and to keep Troutman locked in the patrol car and then repeatedly questioned him about what was in his vehicle.

{¶42} Not only did Trooper Long fail to diligently pursue a means of investigation that was likely to confirm or dispel her suspicions quickly, i.e. searching the vehicle once Troutman consented, she acted unreasonably in failing

to recognize or pursue this avenue. Indeed, the recording of this stop reveals that this was not a swiftly developing situation that required on-the-spot decisions. To the contrary, Trooper Long discussed the situation with the back-up officer, chatted with that officer about other matters, and opened the door to the patrol car to ask the same questions of Troutman and receive the same answers time and time again, which clearly elevated Troutman's argumentative attitude towards her each time she repeated her questions.

{¶43} As previously noted, the touchstone of the Fourth Amendment analysis in determining the reasonableness of a governmental invasion in a citizen's personal security is based on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers. To that end, we must find that Trooper Long acted unreasonably, both in failing to complete the preparation of the ticket for the original purpose of the stop and in doing little but waiting for the canine to arrive rather than searching the vehicle after she was given consent to do so, when all the while Troutman was being held in the back of a locked patrol car and repeatedly subjected to questioning by Trooper Long.

{¶44} For all of these reasons, we find that the trial court erred in overruling Troutman's motion to suppress based upon the unreasonable duration of the stop. The judgment of the Common Pleas Court of Marion County, Ohio, is

reversed and the cause remanded for further proceedings consistent with this opinion.

*Judgment Reversed and*
*Cause Remanded*

**WILLAMOWSKI and ROGERS, J.J., concur.**

**/jlr**