[Cite as *State v. Greene*, 2013-Ohio-4516.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                               :

     Plaintiff-Appellee                    :           C.A. CASE NO.    25577

v.                                          :           T.C. NO.    2012 CR 986

AARON L. GREENE                             :           (Criminal appeal from
                                                            Common Pleas Court)

     Defendant-Appellant                   :

                                            :

         . . . . . . . . . .

**O P I N I O N**

Rendered on the    11th    day of     October    , 2013.

         . . . . . . . . . .

MATTHEW T. CRAWFORD, Atty. Reg. No. 0089205, Assistant Prosecuting Attorney, 301
W. Third Street, 5th Floor, Dayton, Ohio 45422
     Attorney for Plaintiff-Appellee

SCOTT N. BLAUVELT, Atty. Reg. No. 0068177, 246 High Street, Hamilton, Ohio 45011
     Attorney for Defendant-Appellant

         . . . . . . . . . .

DONOVAN, J.

    **{¶ 1}**   This matter is before the Court on the Notice of Appeal of Aaron L. Greene,

filed January 11, 2013.  Greene appeals from his judgment entry of conviction, following a

no contest plea, on one count of improper handling of a firearm in a motor vehicle, in violation of R.C. 2923.16(B), a felony of the fourth degree. The trial court imposed community control sanctions for a period not to exceed five years. The trial court further imposed court costs "as determined by the Montgomery County Clerk of Courts," but neither at the sentencing hearing nor in its judgment entry of conviction, did the court advise Greene that he could be ordered to perform community service for failure to pay court costs.

{¶ 2} Prior to entering his plea of no contest, Greene filed a motion to suppress, which the trial court overruled after a hearing that occurred on September 7, 2012 and October 11, 2012. At the hearing, Brian Shiverdecker testified that he is employed by the Montgomery County Sheriff's Office, and that he has eight years of experience. He stated that on March 29, 2012, while on routine patrol in Harrison Township, at approximately 2:35 p.m., he observed a tan Oldsmobile 88 "traveling northbound on North Main Street without a front license plate displayed on the vehicle." Shiverdecker testified that the vehicle made "an abrupt lane change," without signaling, around another vehicle that was slowed or stopped in traffic. He stated that he initiated a traffic stop, and that the vehicle stopped at the McDonald's parking lot at 4770 North Main Street.

{¶ 3} Shiverdecker stated that Greene was the only occupant of the vehicle. He testified that upon making contact with him, he advised Greene of the reason for the stop, and Shiverdecker stated that, "[w]hile talking to Mr. Greene, I observed him shaking nervously. I could observe his lips quivering. He also had a slight tremble to his voice. I asked Mr. Greene where he was coming from. He stated that he was coming to the McDonald's to pick up I believe it was his cousin from the Horizon Science Academy which

is on Shoup Mill." Shiverdecker further testified, "[a]fter obtaining information from Mr. Greene, I asked him if there were any guns, knives or illegal drugs in the vehicle at which time he stated there were none." Shiverdecker stated that he asked Greene about the presence of any contraband in the vehicle due to Greene's "obvious nervousness," and due to the fact that the North Main Street area is "an area that's high in crime - - narcotics and weapons traffic." Shiverdecker then stated that he asked Greene if he could search his vehicle, and the following exchange occurred:

Q. * * * So you did ask for a consent to search?

A. Yes, I did.

Q. * * * And when, in time, was that? I think you said do you have any guns, knives or weapons in the vehicle.

A. Un-huh.

Q. You said he said no.

A. Correct.

Q. And is that when you asked for a consent to search?

A. Correct. I asked - - I told Mr. Greene if I choose to do so, would you allow me to search your vehicle at which time he stated, "no."

I asked Mr. Greene to clarify by what he meant "no" - - "no," he didn't mind or "no" I could not search his vehicle. Mr. Greene then replied he did not mind if I searched his vehicle but there was nothing in the car.[1]

---

[1]In our view, Greene's "no" response required no clarification. However, this is not dispositive of the issue as to whether the traffic stop was unduly prolonged.

{¶ 4}    Shiverdecker stated that he then "returned to my vehicle to check the validity of his driver's license, to check for any prior contacts with law enforcement and to request a K-9 for a free air sniff due to the uncertainty on whether or not he was going to voluntarily consent to a search of the vehicle."   When asked to identify what about Greene's response to his request to search the vehicle was unclear, Shiverdecker responded, "That just appeared to be - - appeared to me to be some uncertainty on his behalf."   Shiverdecker stated that the K-9 unit arrived within "a short period," and while he awaited its arrival Shiverdecker stated that he "was checking the validity of [Greene's license], any prior contacts with law enforcement and completing a citation."   He stated that the dog arrived prior to the completion of his investigative duties. Shiverdecker stated that when the K-9 unit arrived, he "went back to the car, had Mr. Greene step from the vehicle.   I conducted an outer garment pat-down of Mr. Greene with no weapons being located at which time - - while I was doing that, a key had fallen to the ground that Mr. Greene had on him.   I let Mr. Greene pick it up.  He put it back into his pocket."   Shiverdecker stated that he then escorted Greene to the front of his cruiser while "Deputy Bemis conducted the free air sniff." Shiverdecker stated that he and Greene stood   "between [Greene's] vehicle and my patrol vehicle" while Bemis conducted the sniff.

{¶ 5}    Shiverdecker stated that Bemis "advised that the dog alerted on the vehicle."  At that time, "Mr. Greene was secured in my patrol vehicle at which time me and Deputy Bemis began to search the vehicle from the free air sniff."   Shiverdecker stated that he secured Greene in the cruiser because he and Bemis "both were going to be searching the vehicle, [and] it's not safe for either of us to be inside a vehicle with our back turned to

anyone on any given stop. And also due to the fact that since we were both going to be involved with searching the vehicle, if there was, in fact, something in that vehicle, there's a flight risk of the person from that vehicle."

{¶ 6} Shiverdecker stated that he searched the driver's side of Greene's vehicle while Bemis searched the passenger side. In the course of the search, Shiverdecker stated that the officers found "an uncollectible amount of marijuana shake," which he defined as marijuana residue, on the passenger seat. Shiverdecker then testified as follows:

I returned back to my vehicle. I've had several prior arrests to where a dog has alerted on a vehicle. All that's been located is empty capsules with residue or marijuana shake. And we go back and we search the individual from that vehicle and come to find out that the narcotics are either stuffed in shoes (sic). If it's a female, they'll use the private parts to hide narcotics - -socks, pockets, things like that, so.

I returned back to the vehicle while Deputy Bemis continued searching the - - or I returned back to my patrol vehicle to get with Mr. Greene. Deputy Bemis continued searching the vehicle. I went back to Mr. Greene. I asked him if he would take his shoes off. Mr. Greene began to take his shoes off and handed them up to me.

* * *

I asked Mr. Greene if he would lift his feet up to me. Once his shoes were taken off and handed to me, a search of his shoes * * * was conducted with nothing being found. I asked him to lift his feet up. He did. I did an

outer pat-down of his sock at which time the only thing I felt or located was I felt a key on the bottom of his foot inside his sock.

{¶ 7} Shiverdecker stated that he allowed Greene to put his shoes back on, and that he and Greene then proceeded to stand at the front of the cruiser "because Deputy Bemis was still searching the car at which time Deputy Bemis raised up from the vehicle and said, 'Where's the key to the glovebox?'" Shiverdecker testified that he "asked Mr. Greene where the key was. Mr. Greene replied that he dropped it down the sewer when we were walking back toward my car. I found that to be a lie because there was nothing that fell from his person as we walked past that sewer. The only thing that fell from his person during the entire time of the stop was the key that initially fell" in the course of the pat-down upon his removal from the vehicle.

{¶ 8} Shiverdecker stated that he asked Greene to remove the key from his sock, and that Bemis retrieved the key from Shiverdecker. According to Shiverdecker, as "Deputy Bemis is getting ready to open the glovebox, I asked Mr. Greene if there was anything in that glovebox that's going to get him in trouble. That's when he advised that his cousin may have left a pistol in the car. At the same time, Deputy Bemis advised that he had located a pistol inside the glovebox." When asked whether the weapon was loaded, Shiverdecker responded, "[i]t was not chambered but there was magazine with rounds in it."

{¶ 9} Shiverdecker described his demeanor in the course of the stop as professional, and he stated that he did not draw his weapon or threaten Greene in any way. Shiverdecker stated that once Bemis discovered the weapon, Greene was handcuffed and placed in the rear of Shiverdecker's cruiser. Shiverdecker stated that he did not advise

Greene of his rights or ask him any questions, and that he transported him to jail. Shiverdecker testified that Greene was "issued a citation through Vandalia Municipal Court for display of registration and turn signal." He stated that, in the event the key to the glove box had not been located, he "would've contacted a supervisor and gained approval to break open the glovebox."

{¶ 10} On cross-examination, Shiverdecker stated that he did not believe that Greene made the abrupt lane change to avoid an accident. Shiverdecker stated that Greene remained in Greene's vehicle until Bemis arrived on the scene, and when asked how many minutes Greene sat in his vehicle before Bemis arrived, he responded, "[t]ypical citation for me takes anywhere between 20 minutes to half an hour. You would have to ask Deputy Bemis on his time of arrival." When asked how long it takes to check the validity of a license, Shiverdecker responded, "[d]epending on how slow the computer is running, it could take anywhere from five, ten minutes." Shiverdecker testified as follows:

> * * * I ran him through our nams (sic) system which shows if anyone has ever been in the Montgomery County Jail. You can then pull up their jail ID number 'cause, on occasion, you'll come across one that just says they were booked into the jail. There's no specific charge and it just has a date * * * and that they were booked into the jail. So you can run their jail ID number which consists of finding the jail ID number on the screen, copying and pasting it to the jail charge screen which is on a separate tab on our computer. You click "enter." It then goes through all the charges of that individual that's been in the Montgomery County Jail.

{¶ 11} Shiverdecker stated, after completing the above process, that he "discovered that [Greene] had had a prior agg (sic) menacing. I believe it was concealed weapon and weapons under disability." Shiverdecker stated that he checks license validity and "for prior jail contacts" before he issues citations. He stated that Greene did not have any outstanding warrants, and that his license was valid. He stated that he requested the K-9 unit as soon as he returned to his cruiser, prior to the investigation described above. Shiverdecker stated that once Greene was placed in the cruiser, he was unable to get out. He stated that when he patted down Greene's socks, he was not looking for weapons but for "hidden contraband." Shiverdecker stated that Greene was not under arrest at the time he patted down his socks. Shiverdecker stated that Greene was not cited for marijuana possession. On redirect examination, Shiverdecker stated that from the time he returned to his cruiser and called for the K-9 until the time the unit arrived, he did not deviate from the business of the traffic stop.

{¶ 12} Detective Brad Daugherty of the Montgomery County Sheriff's Office testified that he interviewed Greene at the jail, after advising him of his rights.

{¶ 13} On October 11, 2012, defense counsel and the State entered the following stipulation into the record, which the court accepted:

> Your Honor, I have talked to * * * Deputy Bemis. And he assured
> me of the qualifications of the dog, give (sic) me the dates of when it's been
> certified, the four certifications the dog has, explaining the sniff to me, where
> the dog sniffed. * * * And I'm satisfied that the dog was qualified . I'm
> satisfied that in the time that he got there (sic) . He said he got there two

minutes after he was dispatched. That's what he would have testified to. * *
* I'll stipulate to that.

{¶ 14}   On November 28, 2012, the trial court issued a Decision, Order and Entry
Granting in Part Defendant's Motion to Suppress Evidence. After setting forth the factual
background herein consistent with Shiverdecker's testimony, the court initially determined
that the "traffic stop and search were proper." The court's decision provides:

Here, Defendant was validly stopped for a traffic violation. Deputy
Shiverdecker then determined it was appropriate to conduct a canine free-air
sniff on the vehicle. There is no evidence of undue delay or any
prolongation of the traffic stop to allow for the canine sniff. * * * When the
trained narcotics dog alerts on a vehicle, an officer has probable cause to
search the car. * * * A search of the entire vehicle is permissible upon the
K-9 alert, including a locked glove box. * * * Whether the glove box was
locked or unlocked, once the K-9 alerted to narcotics in the vehicle the police
had probable cause to search that compartment.

Here, the deputies could have simply pried open the glove box.
Instead, they requested a key for it from Defendant. When Defendant denied
having the key, Defendant was searched and the glove compartment key
[was] found in his sock. The fact that Defendant was searched to find the
key does not warrant the exclusion of evidence, because the deputies had the
right to pry open the glove box even if no key was located. * * *

Moreover, the search of Defendant following the K-9 alert falls within

the exigent circumstances exception to the warrant requirement. * * * The warrantless search of Defendant's person was permissible to determine whether he was in possession of narcotics, given the K-9 alert on the vehicle which Defendant alone had occupied.

{¶ 15} The court next concluded that the "time taken to perform the search was proper" as follows:

After stating that the citation process takes 25-30 minutes, Deputy Shiverdecker testified that the drug-sniffing dog arrived within the time typically required for him to check on Defendant's license validity, criminal history, and to write the traffic citations. Deputy Shiverdecker observed Defendant commit the traffic violations at 2:35 p.m., pulled him over one quarter of a mile down the road, made contact, and immediately called for a canine unit based upon his articulated suspicions. Defendant's traffic violations gave Deputy Shiverdecker valid reason to pull him over initially. The drug-sniffing canine unit arrived before Deputy Shiverdecker had completed searching Defendant's records and writing the citations for two traffic violations, a process spanning 25-30 minutes. This Court determines that a reasonable and prudent police officer, taking note of similar specific facts and circumstances, would have made a decision to detain Defendant and call for a canine unit, and that the amount of time it took for the canine unit to arrive was reasonable. The Court need not address the issues raised by Defendant's consent to search. The K-9 alert provided a basis for the vehicle

search, irrespective of whether or not Defendant gave a knowing, voluntary and intelligent consent to search the vehicle.

{¶ 16}   Finally, the court found that Greene's subsequent statements at the jail were made after he was properly advised of his rights, but that the interview at the scene, namely when Shiverdecker asked Greene if there was anything in the glove box that could get him into trouble, "was in the context of a custodial interrogation," and improper.

{¶ 17}   Greene asserts two assignments of error herein.  His first assigned error is as follows:

"THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT IN DENYING HIS MOTION TO SUPPRESS EVIDENCE."

{¶ 18}   According to Greene, "Where, during a traffic stop, an officer detains an individual for an unreasonable period of time, beyond that needed to issue a ticket or warning, evidence discovered during a subsequent automobile search must be suppressed as fruit of the unlawful detention."

{¶ 19}   As this Court has noted

In deciding a motion to suppress, "the trial court assumes the role of trier of facts and is in the best position to resolve questions of fact and evaluate the credibility of witnesses."  *State v. Hopfer*, 112 Ohio App.3d 521, 548, 679 N.E .2d 321 (2d Dist.1996), quoting *State v. Venham*, 96 Ohio App.3d 649, 653, 645 N.E.2d 831 (4th Dist.1994). The court of appeals must accept the trial court's findings of fact if they are supported by competent, credible evidence in the record. *State v. Isaac*, 2d Dist. Montgomery No.

20662, 2005-Ohio-3733, ¶ 8, citing *State v. Retherford*, 93 Ohio App.3d 586, 639 N.E.2d 498 (2d Dist.1994). Accepting those facts as true, the appellate court must then determine, as a matter of law and without deference to the trial court's legal conclusion, whether the applicable legal standard is satisfied. *Id.* *State v. Parson*, 2d Dist. Montgomery No. 25399, 2013-Ohio-2763, ¶ 8.

**{¶ 20}** The Fourth Amendment "guarantees '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]' Searches and seizures conducted without a warrant are per se unreasonable unless they come within one of the ' "few specifically established and well delineated exceptions.' " *Minnesota v. Dickerson*, 508 U.S. 366, 372, 113 S.Ct. 2130, 124 L .Ed.2d 334 (1993), quoting *Thompson v. Louisiana*, 469 U.S. 17, 19-20, 105 S.Ct. 409, 83 L.Ed.2d 246 (1984)." *Parson*, ¶ 9. As this Court noted in *Parson*, "[e]vidence is inadmissible if it stems from an unconstitutional search or seizure. *Wong Sun v. United States*, 371 U.S. 471, 484- 485, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)." *Id.*

**{¶ 21}** Finally, as this Court noted in *Parson*, "[a]n investigative stop, or *Terry* stop, is a common exception to the Fourth Amendment warrant requirement. * * * *Terry v. Ohio,* 392 U.S. 1, 20-22, 30-31, 88 S.Ct. 1868, 29 L.Ed.2d 889 (1968)." *Parson*, ¶ 10. A police officer may initiate an investigative *Terry* stop on an individual "if the officer has a reasonable suspicion, based upon specific and articulable facts, that criminal behavior has occurred or is imminent. *Terry* at 20, 21, 30, 31." *Id.* We note that Greene does not contest the validity of the traffic stop.

**{¶ 22}** As this Court has further noted:

* * * The duration of a traffic stop may last no longer than is necessary to resolve the issue that led to the stop and issue a traffic citation, absent specific and articulable facts that demonstrate a reasonable suspicion of criminal activity other than the traffic violation that justifies continued detention. *State v. Brown* (July 30, 2004), Montgomery App. No. 20336, 2004-Ohio-4058; *State v. Ramos*, 155 Ohio App.3d 396, 801 N.E.2d 523, 2003-Ohio-6535; *State v. Chatton* (1984), 11 Ohio St.3d 59, 463 N.E.2d 1237; *State v. Robinette*, 80 Ohio St.3d 234, 685 N.E.2d 762, 1997-Ohio-343. When a law enforcement officer stops a vehicle for a traffic violation, the officer may detain the motorist for a period of time sufficient to issue a traffic citation and perform routine procedures such as a computer check on the motorist's driver's license, registration and vehicle plates. *Ramos, supra; State v. Carlson* (1995), 102 Ohio App.3d 585, 598-599, 657 N.E.2d 591. These investigative duties must be performed diligently. *Id.*

A canine sniff by a drug detection dog of the exterior of a vehicle lawfully detained for a traffic stop does not implicate Fourth Amendment rights. *Illinois v. Caballes* (Jan. 24, 2005), 543 U.S. 405, 125 S.Ct. 834, 160 L.Ed.2d 842; *State v. Ramos, supra; State v. Heard* (March 7, 2003), Montgomery App. No. 19323, 2003-Ohio-1047. Police are not required to have reasonable suspicion that a vehicle contains drugs prior to conducting a canine sniff of the vehicle during a traffic stop, so long as the duration of the

traffic stop is not extended beyond what is reasonably necessary to resolve the issue that led to the stop and issue a traffic citation. *Ramos, supra*. If, however, the duration of the traffic stop is extended in order to bring a drug sniffing dog to the scene, police must have a reasonable suspicion that the vehicle contains drugs in order to justify the continued detention. *Id. State v. Kuralt*, 2d Dist. Montgomery No. 20532, 2005-Ohio-4529, ¶ 10 -11.

{¶ 23} In determining whether an officer detained a motorist for a time period sufficient to issue a ticket, the "'court must evaluate the duration of the stop in light of the totality of the circumstances and consider whether the officer diligently conducted the investigation.' * * * ." *State v. Batchili,* 113 Ohio St.3d 403, 2007-Ohio-2204, 865 N.E.2d 1282, ¶ 12.

{¶ 24} It is "settled that when a trained narcotics dog alerts on a lawfully stopped vehicle, an officer has probable cause to search the vehicle. *State v. Greenwood*, Montgomery App. No. 19820, 2004-Ohio-2737, at ¶ 11-12." *State v. Pryor*, 2d Dist. Montgomery No. 20800, 2005-Ohio-2770, ¶ 13. As this Court has noted:

Once a police officer has probable cause to believe a vehicle contains contraband, the officer may search a validly stopped motor vehicle. *State v. Madden*, (February 20, 2001) Union App. No. 14-2000-32. The well-established automobile exception to the warrant requirement permits police to conduct a warrantless search of a vehicle. *State v. Madden,* supra. The mobility of automobiles often creates exigent circumstances and concern that evidence will be lost or destroyed. See *State v. Madden*, supra. See also,

*State v. Mills*, (1992), 62 Ohio St.3d 357, 367, 582 N. E.2d 972, citing *California v. Carney*, (1985), 471 U.S. 386, 85 L.Ed.2d 406, 105 S.Ct. 2066. The driver of a vehicle on a public street has a diminished expectation of privacy in the vehicle that he or she is driving. *State v. Madden*, supra; *State v. Ballard* (February 16, 1994) Auglaize App. No. 2-93-12, unreported. See also *California v. Carney*, supra. *State v. Buckner*, 2d Dist. Montgomery No. 21892, 2007-Ohio-4329, ¶ 10.

**{¶ 25}** Finally, under the exigent circumstances exception, "[b]ecause marijuana and other narcotics are easily and quickly hidden or destroyed, a warrantless search [of an individual's person] may be justified to preserve evidence. * * *." *State v. Moore*, 90 Ohio St. 3d 47, 52, 2000-Ohio-10, 734 N.E.2d 804.

**{¶ 26}** Greene directs our attention to *State v. Troutman*, 3d Dist. Marion No. 9-11-17, 2012-Ohio-407, in which he asserts that the Third District "resolved the identical issue with facts very similar to the present case." In *Troutman*, the Third District reversed the decision of the trial court which overruled Troutman's motion to suppress. Troutman was lawfully stopped by Trooper Long for a lane violation, and upon request he produced his license, proof of insurance and registration. *Id*., ¶ 2. Long asked him if he had anything illegal in his vehicle, and Troutman stated that he did not. *Id*., ¶ 3. In the course of the trooper's initial interaction with him, she noticed that his eyes were bloodshot, and she had him exit the vehicle for the purpose of administering a horizontal gaze nystagmus test, as well as an additional test to determine if he was under the influence of marijuana. *Id*., ¶ 4-5. Troutman was patted down upon his removal from the vehicle, and the officer discovered a

bulge of money, in the amount of $3,000.00, in his pocket. *Id*., ¶ 4. The tests she administered did not indicate any impairment. *Id.,* ¶ 5.

{¶ 27} Long placed Troutman in the rear of her cruiser and began checking the validity of his license through a dispatcher. *Id*., ¶ 6. She further requested a canine unit. *Id*. Long asked Troutman multiple questions about the accuracy of the information on his license. *Id*. The dispatcher then advised her that Troutman's license was valid, but that he had a prior drug conviction, and Long again asked him if he had anything illegal in his car. *Id*. Troutman advised her "that he did not have anything illegal and that she could search his vehicle, and she advised him that she had a canine unit en route to search his vehicle." *Id*.

{¶ 28} After a back-up officer arrived and advised Long that he knew Troutman was a drug dealer, "[o]ver the next several minutes, Trooper Long repeatedly opened the door to the cruiser and questioned Troutman about whether he had anything illegal in his vehicle and informed him that she was only asking because she had a canine unit on the way." *Id.,* ¶ 7. Troutman "told her a few more times that she could search his vehicle, including running the dog around the vehicle, and she stated that she was waiting for the canine unit." *Id*.

{¶ 29} As she continued to wait for the canine unit, Long "again asked Troutman if he had anything in the lining of his jacket. He told her that he did not and asked her whether she was going to write him a ticket." *Id.*, ¶ 8. After Long repeated that she waiting for the canine unit, Troutman revoked his consent to search his vehicle. *Id*. Long did not allow Troutman to exit the cruiser, and she closed the door. *Id.* Upon receiving a

message from dispatch regarding the location of the canine unit, Long opened the cruiser door and told Troutman "that it would be just a few minutes." *Id*., ¶ 9. Troutman "asked why he was being detained because he did not understand Trooper Long's actions once she checked his license, which was valid, and learned that there were no warrants for his arrest." *Id.* Long "told him that this was standard procedure, * * * and to 'chill out' for a few minutes and she would release him once the canine sniffed his vehicle." *Id.*

{¶ 30} "At some point," Long asked Troutman "why he was so nervous, 'acting so paranoid,' and had his hands balled. He told her that he was not nervous or paranoid * * * ." *Id*., ¶ 10. "He then reminded her that he told her she could search his vehicle but that he was refusing to give her permission to search it now because of how she was acting towards him." *Id.*

{¶ 31} Finally, a "few minutes after this last exchange, the canine unit arrived. Eight minutes after Troutman revoked his consent to search his vehicle, the police dog * * * alerted to the presence of drugs in the vehicle," and a search produced what appeared to be cocaine. *Id*., ¶ 11. Several pills that Troutman admitted were his were found in the rear of the cruiser where he had been sitting. *Id*.

{¶ 32} The Third District found the following facts significant:

[T]hroughout the time that Troutman was in the back of the patrol car, including after Trooper Long had received the information regarding Troutman's license, registration, insurance, and lack of warrants and after Troutman had repeatedly given Trooper Long consent to search his vehicle, she never began to actually write the traffic ticket or to personally search his

vehicle or have the other officer search it. She simply waited around for the canine to arrive and *repeatedly* questioned Troutman about whether he had anything illegal in his vehicle or on his person. Under these circumstances, we cannot conclude that Trooper Long diligently conducted her investigation into the reason for the initial stop of the vehicle, i.e. the marked lanes violation. *Id.*, ¶ 36.

{¶ 33} The Third District concluded as follows:

> * * * the touchstone of the Fourth Amendment analysis in determining the reasonableness of a governmental invasion in a citizen's personal security is based on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers. To that end, we must find that Trooper Long acted unreasonably, both in failing to complete the preparation of the ticket for the original purpose of the stop and in doing little but waiting for the canine to arrive rather than searching the vehicle after she was given consent to do so, when all the while Troutman was being held in the back of a locked patrol car and repeatedly subjected to questioning by Trooper Long. *Id.*, ¶ 43.

{¶ 34} The record herein is clear that Shiverdecker, unlike Long, was diligent in his investigation in the course of the lawful traffic stop. After stopping Greene, obtaining his information, and inquiring if anything illegal was in the vehicle, Shiverdecker returned directly to his cruiser to check the validity of Greene's license and determine if he had a criminal history. At that time, Shiverdecker requested a K-9 unit, and the dog arrived while

Shiverdecker was in the course of completing his investigative duties. Greene stipulated to the dog's timely arrival, just two minutes after dispatch. In other words, the duration of the stop, unlike in *Troutman*, was not prolonged beyond what was reasonably necessary to issue a traffic citation to Greene. Upon the dog's arrival, Shiverdecker returned to Greene's vehicle, removed him, and conducted a pat down for weapons. Bemis conducted the sniff while Shiverdecker and Greene stood at the front of Shiverdecker's cruiser and, as noted above, the sniff of Greene's lawfully stopped vehicle did not implicate his Fourth Amendment rights. After the dog alerted, Greene was placed in Shiverdecker's cruiser so that the officers could search his vehicle, including the locked glove box, pursuant to the automobile exception. After finding marijuana residue, and based upon his experience, in the context of canine sniffs, with suspects who conceal contraband on their persons, Shiverdecker returned to his cruiser and asked Greene to remove his shoes. This search of Greene's person was justified by the totality of the circumstances and the facts as developed, including the presence of "shake" and the canine alert. In the course of an outer pat-down of Greene's socks, Shiverdecker discovered the key to the glove box while Bemis continued to search the car. When Bemis advised Shiverdecker that the glove box was locked, Shiverdecker retrieved the key and gave it to Bemis. As the trial court noted, the deputies had the right to open the locked glove box in the absence of a key.

{¶ 35} Since Shiverdecker did not deviate from the business of the lawful traffic stop, and did not, as in *Troutman*, complete his investigatory duties and then "wait around" for the K-9 unit to arrive, the weapon retrieved from the glove box is not subject to suppression. Greene's first assigned error lacks merit and is overruled.

{¶ 36}   Greene's second assignment of error is as follows:

"THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT IN THE IMPOSITION OF COURT COSTS."

{¶ 37}   According to Greene, "Where a trial court fails to advise a defendant, either at the sentencing hearing or within the termination entry, that the failure to pay court costs as ordered may result in a requirement that the defendant perform community service, said order is invalid and the judgment should be modified to eliminate the potential for community service."   The State concedes that the trial court erred in this respect, and it requests that this Court "remand the case to the trial court for the community service notification."

{¶ 38}   In *State v. Jeffery*, 2d Dist. Montgomery No. 24916, 2013-Ohio-504, the trial court failed to advise Jeffery that he could be subject to community service for failure to pay court costs, and as here, the State did not agree to a modification of Jeffery's sentence.   *Id*., ¶ 45.   This Court declined to modify Jeffery's sentence and remanded the matter for the proper imposition of court costs pursuant to R.C. 2947.23(A)(1)(a), which includes notification that "the court may order the defendant to perform community service" if the defendant fails to pay court costs.   We again accept this as the proper remedy herein.

{¶ 39}   Greene's first assigned error having been overruled, and his second assigned error having been sustained, the matter is remanded for the limited purpose of advising Greene that he may be ordered to perform community service for failure to pay court costs. The judgment of the trial court is affirmed in all other respects,.

. . . . . . . . . .

FAIN, P.J. and FROELICH, J., concur.

Copies mailed to:

Matthew T. Crawford
Scott N. Blauvelt
Hon. Mary L. Wiseman