TUCKER, J.
{¶ 1} Plaintiff-appellant, the State of Ohio, appeals from the trial court's decision of January 26, 2017 sustaining in part and overruling in part a motion to suppress filed by Defendant-appellee, Matthew I. Mee. The State argues that the trial court erred by sustaining Mee's motion in part with respect to evidence obtained as the result of a search of Mee's vehicle during a traffic stop. In its decision, the trial court determined that the search was unlawful because Mee was detained for a longer interval than was reasonably necessary. We find that Mee's detention did not last longer than was reasonably necessary, and we therefore reverse.
I. Facts and Procedural History
{¶ 2} On April 4, 2016, Officer Spinks of the Kettering Police Department, on routine patrol in a marked cruiser, witnessed a traffic violation "on Research Boulevard just east of Founders Drive." Tr. of Hr'g on Mot. to Suppress 6, 8-9 and 23 [hereinafter Tr. of Hr'g ]. Specifically, he saw a vehicle being driven by Mee "in the left through lane * * * drift[ ]* * * into the right lane and then [return to] the left * * * lane," crossing the dividing line between the two lanes in the process, and violating § 432.08 of the Kettering Codified Ordinances [hereinafter KCO ].[1] Id. at *1023 9, 19 and 30. Officer Spinks stopped the vehicle shortly afterwards at approximately 1:59 a.m., near the intersection of Shakertown Road and County Line Road. See id. at 10 and 53.
{¶ 3} With Mee's vehicle stopped, Officer Spinks "called out to dispatch, [reporting] the registration [number of] the vehicle and [the] location" of the stop. Id. at 10. He approached the vehicle from the driver's side, identified himself to Mee and the two passengers with Mee, and explained that he made the stop as the result of Mee's "failure to maintain a continuous lane." Id. at 10 and 13. After obtaining Mee's proof of insurance and driver's license, and identification from the two passengers, Officer Spinks asked Mee "where he was coming from" and whether he had "consumed any alcohol," because, based on past observations of other drivers "drifting the way that he did," Officer Spinks suspected that Mee might have been intoxicated. Id. Mee denied that he had consumed any alcohol, and Officer Spinks "didn't smell any alcohol in the car [,] which kind of assured that that wasn't the case." Id. at 10-11. In response to a follow-up question from Officer Spinks, Mee and his two passengers also denied that "there were any drugs in the vehicle." Id. at 11.
{¶ 4} Officer Spinks returned to his cruiser to run background checks "through LEADS [the Law Enforcement Automated Data System,] NCIC [the National Crime Information Center] and JusticeWeb." Id. at 11-12. This revealed that a drug-related driver's license suspension had been imposed on one of Mee's passengers ("Passenger One") in 2014. See id. at 13. While Officer Spinks was running background checks, a second officer with the Kettering Police Department, Officer Maloney, and his K-9 partner, Jax, responded to the stop to provide backup for Officer Spinks.[2] Id. at 13, 34, 62-65, 130-131 and 143-144. Officer Spinks estimated that Officer Maloney arrived at approximately 2:03 or 2:04 a.m.; similarly, Officer Maloney estimated that he arrived within one to three minutes after Officer Spinks stopped Mee's vehicle. Id. at 53 and 87.
{¶ 5} In light of the results of the background checks, and at least partly prompted by Officer Maloney's arrival, Officer Spinks decided to ask for consent to search Mee's vehicle or, in the event that Mee did not consent, to have Officer Maloney and Jax conduct a free-air sniff. See id. at 14 and 53. Officer Spinks, now accompanied by Officer Maloney, returned to Mee's vehicle, again asked Mee and his passengers whether "they had any drugs or anything illegal in the vehicle," and requested Mee's consent to a search. Id. at 14 and 65-66. Mee declined, indicating that he wanted to go home.[3] Id. at 14 and 66. Along with one of his passengers ("Passenger Two"), Mee testified that Officer Spinks had spent roughly five to ten minutes in his cruiser before he and Officer *1024 Maloney returned to ask for consent.[4] Id. at 131 and 144.
{¶ 6} At that point, Officer Spinks informed Mee that he intended to have Officer Maloney and Jax conduct a free-air sniff and that, in accord with departmental policy, he would require Mee and the two passengers to exit Mee's vehicle for that purpose.[5] Id. at 14-15, 50 and 67. Officer Spinks had Mee exit first and requested permission to pat him down for weapons; Mee consented.[6] Id. at 15 and 67. Approximately 12 to 15 minutes had passed since Officer Spinks initiated the stop. Id. at 15, 67 and 148.
{¶ 7} In Mee's "left side jacket pocket, [Officer Spinks] felt a bottle" and "hear[d] a bag," so he asked Mee if he "could put [his] hands into [Mee's] pocket" to retrieve the items. Id. at 15 and 67. Mee again consented.[7] Id. at 57-58. The contents of Mee's pocket proved to be "a pill bottle and a bag that contained a bunch of pills." Id. at 15. Mee told Officer Spinks that the pills were pain medication, but when Officer Spinks "looked at the bottle and compared what the bottle said to what the pills looked like, they weren't the same."[8] Id. This prompted Officer Spinks to place Mee in handcuffs and take him into investigative detention. Id.
{¶ 8} Officer Spinks and Officer Maloney next asked Passenger Two to exit Mee's vehicle. Id. at 17 and 69. As Passenger Two emerged from the vehicle, Officer Spinks saw what looked like two "Rice Krispie treats and a brownie" on the floorboard in front of Passenger Two's seat, and when the officers asked what the items were, Passenger Two indicated that they were "treats that had been baked with marijuana and * * * had been given to him by Mr. Mee."[9] Id. Believing that they had probable cause, the officers then undertook a complete search of Mee's vehicle without the assistance of Jax. See id. at 17-18 and 69-70.
{¶ 9} Officers Spinks and Maloney eventually discovered felony-level drugs contained in a lockbox, which they found inside a bookbag belonging to Mee. Id. at 17-18, 72. Officer Maloney then informed Mee of his Miranda rights. Id. at 72. The officers never conducted a free-air sniff, and Officer Spinks only later completed a *1025 written traffic citation-once they "got back to the police department." Id. at 49.
II. Analysis
{¶ 10} For its sole assignment of error, the State contends that:
THE TRIAL COURT ERRED IN SUSTAINING MEE'S MOTION TO SUPPRESS BECAUSE OFFICER SPINKS DID NOT PROLONG THE TRAFFIC STOP BEYOND THE TIME REASONABLY REQUIRED TO COMPLETE HIS INVESTIGATION OF THE TRAFFIC VIOLATION AND ISSUE A CITATION.
{¶ 11} An appellant has three methods for challenging a trial court's ruling on a motion to suppress: (1) contesting the court's findings of fact; (2) asserting that the court evaluated the facts pursuant to the wrong test; and (3) arguing that the court drew the wrong legal conclusion from the facts. See In re Long , 5th Dist. Stark No. 2004-CA-00377, 2005-Ohio-3825, 2005 WL 1785100, ¶ 3. A challenge of the last variety, which the State brings in the instant matter, requires that an appellate court "independently determine, without deference to the trial court's conclusion, whether the facts meet the [applicable] legal standard." Id. , citing State v. Curry , 95 Ohio App.3d 93, 96, 641 N.E.2d 1172 (8th Dist. 1994), State v. Claytor , 85 Ohio App.3d 623, 627, 620 N.E.2d 906 (4th Dist. 1993), and State v. Guysinger , 86 Ohio App.3d 592, 621 N.E.2d 726 (4th Dist. 1993) ; see Appellant's Br. 5.
{¶ 12} The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures. Terry v. Ohio , 392 U.S. 1, 8, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Warrantless searches and seizures violate this prohibition unless conducted pursuant to one of the "few specifically established and well-delineated exceptions." (Citations omitted.) Katz v. United States , 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). One of these exceptions "is commonly known as an investigative or Terry stop," which includes the temporary detention of motorists for the enforcement of traffic laws. State v. Dorsey , 10th Dist. Franklin No. 04AP-737, 2005-Ohio-2334, 2005 WL 1119613, ¶ 17, citing Terry , 392 U.S. 1, 88 S.Ct. 1868.
{¶ 13} Though not necessarily requiring a warrant, the temporary "detention of [persons] during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning" of the Fourth Amendment. (Citations omitted.) Whren v. United States , 517 U.S. 806, 809-810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). An "automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." Id. at 810, 116 S.Ct. 1769. Generally, a police officer's decision to stop an automobile will comport with this requirement if the officer has a "reasonable suspicion" of criminal activity. United States v. Lopez-Soto , 205 F.3d 1101, 1104-1105 (9th Cir. 2000) ; State v. Mays , 119 Ohio St.3d 406, 2008-Ohio-4539, 894 N.E.2d 1204, ¶ 23. A "seizure justified only by a police-observed traffic violation," however, " 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." Rodriguez v. United States , ---U.S. ----, 135 S.Ct. 1609, 1612, 191 L.Ed.2d 492 (2015), quoting Illinois v. Caballes , 543 U.S. 405, 407, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005). After "the reasonable * * * time for issuing [a] traffic citation has [elapsed], an officer must have a reasonable articulable suspicion of illegal activity to continue the detention." State v. Ramos , 155 Ohio App.3d 396, 2003-Ohio-6535, 801 N.E.2d 523, ¶ 13 (2d Dist.).
{¶ 14} Nevertheless, official "conduct that does not 'compromise any legitimate *1026 interest in privacy' is not a search subject to the Fourth Amendment." Caballes , 543 U.S. at 408, 125 S.Ct. 834, quoting United States v. Jacobsen , 466 U.S. 109, 123, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984). In United States v. Place , 462 U.S. 696, 707, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), the United States Supreme Court held that the use of "a well-trained narcotics-detection dog" to examine unopened personal luggage "did not constitute a 'search' within the meaning of the Fourth Amendment" because "the manner in which information is obtained through this investigative technique is much less intrusive than a typical search," and because such an examination "discloses only the presence or absence of narcotics, a contraband item." See also Jacobsen , 466 U.S. at 121-123, 104 S.Ct. 1652 (finding no legitimate privacy interest in the possession of contraband). Relying on its holding in Place , the Court found in Caballes that "conducting a dog sniff would not change the character of a traffic stop that is lawful at its inception and otherwise executed in a reasonable manner." Caballes , 543 U.S. at 408, 125 S.Ct. 834.
{¶ 15} In this case, the trial court determined that "the reasonable time for the traffic stop was concluded once Off[icer] Spinks completed running" background checks on Mee and his two passengers. Decision, Order & Entry Overruling in Part and Sustaining in Part Defendant's Motion to Suppress 9, Jan. 26, 2017 [hereinafter Decision ]. The court made this determination consequent to its finding that Officer Spinks had no "reasonable suspicion of criminal activity other than the traffic violation that would [have] justif [ied]" the continued detention of Mee and his passengers beyond that point-that is, the completion of the background checks-because Officer Spinks "did not believe that Mee appeared nervous" during the encounter; because "Mee and his passengers denied the presence of any drugs within [Mee's] vehicle"; and because the "only occupant of the [vehicle] who had any criminal record" was Passenger One. Decision 7-8.
{¶ 16} We would concur with the trial court were the standard primarily based upon the initial purpose of the traffic stop, rather than the stop's temporal duration. In Rodriguez , the United States Supreme Court held that a "seizure justified only by a police-observed traffic violation" becomes " 'unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' " of issuing a ticket for the violation, remarking that this holding "adhere[d] to the line [it had earlier] drawn" in Caballes . (Emphasis added.) Rodriguez , 135 S.Ct. at 1612 (Ginsberg, J.), quoting Caballes , 543 U.S. at 407, 125 S.Ct. 834. The line drawn in Caballes is exactly as stated in Rodriguez : that a free-air search with a drug-dog "during a lawful traffic stop[ ] generally does not implicate legitimate privacy interests" so long as the stop "is [not] prolonged beyond the time reasonably required" to resolve the issue that initially precipitated the stop. See Caballes , 543 U.S. at 407-409, 125 S.Ct. 834.
{¶ 17} Justice Ginsberg, who wrote the majority opinion in Rodriguez , dissented from the Caballes decision. Referring to the Court's seminal decision in Terry , the justice noted that "[i]n a Terry -type investigatory stop, 'the officer's action [must be] justified at its inception, and * * * reasonably related in scope to the circumstances which justified the interference in the first place.' " (Emphasis added.) Caballes , 543 U.S. at 419, 125 S.Ct. 834, quoting Terry v. Ohio , 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Reasoning from this principle, Justice Ginsberg indicated that she "would apply Terry 's reasonable-relation test, * * *, to determine whether [a] canine sniff impermissibly expand[s] the scope of [an] initially valid seizure," adding *1027 that in her view, "it [should] hardly [be] dispositive that [a] dog sniff * * * may not * * * lengthen[ ] the duration of [a] stop." (Emphasis added.) Id. at 420-421, 125 S.Ct. 834.
{¶ 18} Yet, by adhering to the line drawn in Caballes when it decided Rodriguez , the Court implicitly, albeit not unequivocally, repudiated a primarily purpose-based or scope-based standard. For instance, Justice Ginsberg (again, writing for the majority) stated that a police officer "may conduct certain unrelated checks during an otherwise lawful traffic stop," though the officer "may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining a[ ] [person]." Rodriguez , 135 S.Ct. at 1615. The justice's majority opinion later adds that "[i]f an officer can complete traffic-based inquiries expeditiously, then that is the amount of 'time reasonably required to complete' " the stop. Id. at 1616, quoting Caballes , 543 U.S. at 407, 125 S.Ct. 834. Despite the Court's announced intention to adhere to the line drawn in Caballes , however, the foregoing remarks suggest that a traffic stop would become unlawful if an unrelated drug-dog sniff would " 'measurably extend' " the duration of the stop, which appears to conflict with Caballes . (Emphasis added.) Id. , quoting Arizona v. Johnson , 555 U.S. 323, 333, 129 S.Ct. 781, 172 L.Ed.2d 694 (2009) ; compare with Caballes , 543 U.S. at 407-408, 125 S.Ct. 834. In other words, the notion that a free-air search with a drug-dog may not "measurably extend" the duration of a stop justified solely by a traffic infraction appears to be at odds with the notion that such a search is permissible so long as it does not extend the stop beyond the time "reasonably required" to issue a traffic citation; ordinarily, the words "reasonable" or "reasonably" are used to refer to concepts or principles that do not readily admit of a single, inflexible definition. See , e.g. , Payton v. New York , 445 U.S. 573, 600, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (referring to "the word 'reasonable' " as "amorphous"); STMicroelectronics, N.V. v. Credit Suisse Securities (USA) LLC , 648 F.3d 68, 81 (2d Cir. 2011) (referring to "the word 'reasonable' " as "inherently imprecise"). Justice Kennedy, in fact, wrote a dissent airing his belief that the Rodriguez majority opinion "cannot be reconciled with [the Caballes ] decision * * * or a number of common police practices." Rodriguez , 135 S.Ct. at 1617.
{¶ 19} In the wake of Rodriguez , Ohio courts have continued to apply a duration-based standard for evaluating traffic stops such as the stop at issue in this case. See , e.g. , State v. Matheney , 2d Dist. Montgomery No. 26876, 2016-Ohio-7690, 2016 WL 6672805, ¶ 21-32 ; State v. Neal , 10th Dist. Franklin No. 15AP-771, 2016-Ohio-1406, 2016 WL 1288000, ¶ 15-23 ; State v. Reece , 1st Dist. Hamilton No. C-140635, 2015-Ohio-3638, 2015 WL 5257151, ¶ 15-25 ; but see State v. Hill , 2d Dist. Montgomery No. 26345, 2016-Ohio-3087, 2016 WL 2944821, ¶ 10-14 (describing Rodriguez as "arguably prohibit[ing] [a] seizure[ ] resulting from inquiries unrelated to the initial purpose of a traffic stop" if the unrelated inquiries measurably extend the stop's duration). These cases establish that to determine whether a police officer completes a traffic stop within a reasonable length of time, a court should evaluate the duration of the stop in light of the totality of the circumstances and consider whether the officer diligently pursued the corresponding investigation. (Citations omitted.) Matheney , 2016-Ohio-7690, 2016 WL 6672805, ¶ 22. Furthermore, we continue to subscribe to the principle that "a police officer need not have a reasonable suspicion that a vehicle contains contraband prior to conducting a canine sniff of the vehicle during a traffic stop ' "so long *1028 as the duration of the traffic stop is not extended beyond what is reasonably necessary to resolve the issue that led to the stop and [to] issue a traffic citation." ' " (Emphasis added.) Id. at ¶ 23, quoting State v. Greene , 2d Dist. Montgomery No. 25577, 2013-Ohio-4516, 2013 WL 5603936, ¶ 22, internally quoting State v. Kuralt , 2d Dist. Montgomery No. 20532, 2005-Ohio-4529, 2005 WL 2087581, ¶ 10-11.
{¶ 20} Here, the record demonstrates that Officer Spinks diligently pursued his traffic-related investigation and did not unreasonably prolong the period of Mee's detention. He had a brief initial discussion with Mee and immediately returned to his cruiser to run background checks on Mee and the two passengers in Mee's vehicle. Tr. of Hr'g 141-143. At approximately the same time, Officer Maloney arrived to provide backup. Officer Spinks had not requested a K-9 unit, meaning that he did not keep Mee waiting for a K-9 unit to arrive. Id. at 64-65.
{¶ 21} After running background checks, Officer Spinks decided to ask Mee for permission to search his vehicle, or in the alternative, to have Officer Maloney and Jax conduct a free-air sniff, which would not have implicated the Fourth Amendment. He did not delay after completing the background checks, but instead promptly returned to Mee's vehicle and requested consent for a search. Mee had been detained between five and ten minutes by that time. Tr. of Hr'g 130-131 and 143-144. Upon Mee's refusal to consent to a search, Officer Spinks asked him to exit his vehicle for a free-air sniff and requested his consent to a pat-down search for weapons.
{¶ 22} At that point in the stop, 12 to 15 minutes had passed. Id. at 148. Although Officer Spinks had not yet prepared a written traffic citation, the record strongly supports the conclusion that the stop would have taken essentially the same amount of time had Officer Spinks simply begun writing a ticket immediately after he finished the background checks on Mee and the two passengers. In other words, at the time Officer Spinks received Mee's consent for a pat-down, the stop had not extended beyond the time that would otherwise reasonably have been required to complete the " 'mission of issuing a ticket for the [traffic] violation.' " Rodriguez v. United States , --- U.S. ----, 135 S.Ct. 1609, 1612, 191 L.Ed.2d 492 (2015), quoting Illinois v. Caballes , 543 U.S. 405, 407, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005).
{¶ 23} Once Officer Spinks discovered the pill bottle and the plastic bag containing pills in Mee's pocket, he and Officer Maloney acquired reasonable suspicion such that further detention of Mee was warranted. The term "reasonable suspicion" is " 'vaguely defined as something more than an inchoate or unparticularized suspicion or "hunch," but less than the level of suspicion required for probable cause.' " State v. Shepherd , 122 Ohio App.3d 358, 364, 701 N.E.2d 778 (2d Dist. 1997), quoting State v. Osborne , 2d Dist. Montgomery No. 15151, 1995 WL 737913, *4 (Dec. 13, 1995). We recognize that carrying prescription medication in a container other than a bottle bearing a pharmacist's label is not of itself illegal. See R.C. 3719.08 - 3719.09. Under the circumstances, however, the suspicions of Officers Spinks and Maloney could reasonably have been aroused by the fact that Mee was carrying not only a properly labelled bottle, but also a bag containing a "bunch of pills" that did not correspond to the label on the bottle. Tr. of Hr'g 15. Though this certainly falls far short of the standard of probable cause, we find that it did support a reasonable suspicion of possible illegal activity. See, e.g., R.C. 2925.14(A)(10) (defining "drug paraphernalia" as, among other things, "capsule[s], balloon[s], envelope[s], *1029 or container[s] for packaging small quantities of a controlled substance"); State v. Jones , 8th Dist. Cuyahoga No. 71178, 1997 WL 599377, *3 (Sept. 25, 1997) ; State v. Boone , 108 Ohio App.3d 233, 237-238, 670 N.E.2d 527 (1st Dist. 1995) (finding that a plastic bag qualified as a "container" for purposes of R.C. 2925.14 ); State v. Reece , 3d Dist. Marion No. 9-93-34, 1994 WL 83416, *4 (Mar. 14, 1994) (referring to "expert evidence" showing that plastic bags are among "the types of items commonly used in the drug trade").
III. Conclusion
{¶ 24} We find that Mee's detention did not last longer than was reasonably necessary under the circumstances, and therefore, we sustain the State's assignment of error. The decision of the trial court is reversed, and the case is remanded to the trial court for further proceedings consistent with this opinion.
WELBAUM, J., concurs.

Under KCO 432.08(a), "[w]henever any roadway has been divided into two or more clearly marked lanes for traffic," a vehicle "shall be driven, as nearly as is practicable, entirely within a single lane or line of traffic and shall not be moved from such lane or line until the driver has first ascertained that such movement can be made with safety." See also R.C. 4511.33(A)(1).

Officer Spinks testified that Officer Maloney arrived with the background checks already in progress. Tr. of Hr'g 13 and 34. Mee and one of the passengers testified that Officer Maloney arrived as, or shortly after, Officer Spinks returned to his cruiser, which generally fits with Officer Spinks's testimony. Id. at 130-131 and 143-144. Officer Maloney testified that he arrived while "Officer Spinks was talking to the occupants of [Mee's] vehicle" and that he "began to exit [his] patrol car about the same time that Officer Spinks" finished speaking with them. See id. at 65.

Mee stated that Officer Spinks asked him three times for consent to search his vehicle, though his testimony includes specific references to only two such requests. Tr. of Hr'g 143 and 145-147.

Passenger One, the passenger who had a drug-related driver's license suspension in 2014, did not testify at the hearing on Mee's motion to suppress. See Tr. of Hr'g 13 and 133. Officer Spinks was not asked how long he took to complete the background checks. Though Officer Maloney did not recall how long the background checks took, he indicated that "that process [usually] takes several minutes." Id. at 87.

Officer Maloney testified that he, rather than Officer Spinks, might have asked Mee to exit the vehicle. Tr. of Hr'g 66. Neither officer used the word "policy," but Officer Maloney stated that he was "trained not" to allow occupants to remain in a vehicle during a free-air sniff. Id. at 14-15, 50, 54-55 and 67. Officer Spinks testified that removing the occupants of a vehicle during a free-air sniff is "protocol" for "their safety, because of the dog, and so that they can't interfere." Id. at 50.

Mee denies that Officer Spinks requested permission to conduct the pat-down. Tr. of Hr'g at 149.

Mee denies that he consented. Tr. of Hr'g at 149.

Officer Maloney, and Mee himself, testified that Mee told Officer Spinks that the pills were Xanax, a prescription medication for the treatment of anxiety disorders. Tr. of Hr'g at 68 and 149; United States Food & Drug Administration, Medication Guides-Xanax , https:wwwaccessdatafdagovdrugsatfda_docs/label/2016/018276s052lbl.pdf #page=24 (accessed June 27, 2017).

Passenger Two denies that he made these statements.