[Cite as *State v. Williams*, 2026-Ohio-860.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| Appellant | : | C.A. No. 30649 |
| | : | |
| | : | Trial Court Case No. 2025 CRB 1688 |
| v. | : | |
| | : | (Criminal Appeal from Municipal Court) |
| WARREN MICHAEL WILLIAMS | : | |
| | : | **FINAL JUDGMENT ENTRY &** |
| Appellee | : | **OPINION** |
| | : | |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on March 13, 2026, the judgment of the trial court is reversed and the matter is remanded for further proceedings consistent with the opinion.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

For the court,

*Mary K. Huffman*

MARY K. HUFFMAN, JUDGE

LEWIS, P.J., and EPLEY, J., concur.

OPINION

STEPHANIE L. COOK, Attorney for Appellant
ANTONY A. ABBOUD, Attorney for Appellee

HUFFMAN, J.

{¶ 1} The State of Ohio appeals from a judgment entry sustaining in part the motion to suppress of Warren Michael Williams. For the following reasons, the judgment of the trial court is reversed, and the matter is remanded for further proceedings.

**Facts and Procedural History**

{¶ 2} On May 14, 2025, Williams was charged by way of complaint with obstructing official business in connection with his flight from the scene of a traffic stop. On August 1, 2025, Williams filed a motion to suppress. Following a hearing, the court sustained the motion in part, and the State timely appealed. Before addressing the State's sole assignment of error, we review the evidence adduced at the suppression hearing and the trial court's decision in favor of Williams.

{¶ 3} Dayton Police Officer Austin Carter testified that on May 12, 2025, at around 10:00 p.m. and while on patrol alone, he proceeded to the area of 2500 Oakridge Drive near Walton Avenue in a marked cruiser on a complaint by an RTA bus driver that a car was illegally parked and blocking a bus stop. Carter had been a police officer for less than a year at the time, and he was still under a probationary period with the police department. Upon arrival, Carter observed a vehicle matching the description that he received, and it was situated directly adjacent to a "no parking" sign. From his cruiser, he ran the plate on the vehicle and determined that the registered owner was not from Dayton. Carter activated his lights, approached the passenger side door according to his routine practice, and saw two

occupants. Williams was in the driver's seat, and a woman was in the front passenger seat. The woman was "not wearing a lot of clothing." Carter advised the occupants of the reason for the stop, and then he walked to the driver's side, obtained Williams's driver's license, and returned to his cruiser. He viewed a LEADS output for "warrants, probation," and reviewed Williams's "history with us as well."

{¶ 4} Carter learned that Williams was on federal probation or parole for weapons and drug trafficking, which heightened his concerns about the stop because in his experience, drugs and weapons go together. He testified that he "just didn't feel safe with him in the car." For his own safety, Carter removed Williams and patted him down, finding no weapons. Next, according to Carter's testimony, they "head[ed] back to the car because I explain[ed] to him, 'I'm just going to put you in the back seat.'" At that moment, Williams fled. When asked if he had intended to issue a citation to Williams for the parking violation, Carter said:

> At this point still had not – I was separating him and his passenger from the car so that I could talk to the passenger as well to figure out what they were gonna do in there. At that point in time I was not going to cite him for parking. I was going to give him a warning. I also wanted to figure out a business we were doing out here as well.

{¶ 5} Carter pursued Williams on foot but was unable to find him. He stated that there were officers in unmarked police cars in the area who also engaged in the search, along with a canine, but Williams was not located. The female passenger was allowed to leave, and the vehicle was towed from the scene. A portion of Carter's body camera video was played for the court.

{¶ 6} On cross examination, Carter acknowledged that he did not see any contraband or weapons in the vehicle. He testified that he did not recall if Carter had a valid driver's license, and he stated that Williams was not in violation of his federal probation. Carter stated that from the beginning of the stop, he suspected that Williams and the woman were engaged in prostitution, based on his training and experience, the fact that they were parked in a car with tinted windows, and the way the woman was dressed. Carter intended to investigate. His testimony suggested that Williams had "history with this." Carter said that he intended to "have a conversation" with Williams and the female passenger about "what they were doing tonight. Why they were there." On redirect examination, Carter testified that issuing a traffic citation was within his discretion. He had not ruled out doing so, and he was still gathering information.

{¶ 7} The trial court determined that Williams committed a traffic violation when he illegally parked his vehicle, giving Officer Carter sufficient probable cause to stop and detain him to issue a citation. The court next evaluated the "the totality of the stop as a whole and whether [Williams] was unreasonably detained beyond the scope" of the stop. The court found that Carter was permitted to ask Williams for his driver's license, "run ordinary inquiries and searches of [Williams's] driver's license" to check for outstanding warrants, ascertain the status of his vehicle registration, and ask for proof of insurance. The court determined that Carter was justified in removing Williams for a pat down for officer safety and that doing so did not prolong the traffic stop longer than necessary. The court's decision merely noted that Williams was on parole for "federal gun related offenses" without mention of Williams's drug trafficking history.

{¶ 8} The court next considered Carter's testimony that he advised Williams that he intended to put him in his cruiser. It was significant to the court that at "no point during the

4

officer's interactions with [Williams] did the officer refer to writing a citation or begin to write a warning or citation for the violation." The court found the following statements by Carter on direct and cross-examination about his intention to issue a citation to be determinative: "At that point in time, I was not going to cite him for the parking violation. I was going to give him a warning," and "I was going to have a conversation with him." The court found that before Carter asked Williams to sit in his cruiser, "his interactions were lawful inquiries and within the scope of the traffic stop," but the court concluded that when Carter asked Williams to have a seat in his cruiser, "this action prolonged the stop and . . . unlawfully detained [Williams] beyond the original purpose of the traffic stop." The court determined that Carter "had no reasonable suspicion of criminal activity giving reason to further detain [Williams]." The court granted the motion to suppress in part "as to the continued detention of [Williams]."

**Assignment of Error and Analysis**

{¶ 9} The State asserts one assignment of error. According to the State, the trial court erred in finding that Carter lacked reasonable articulable suspicion to extend the traffic stop. For the following reasons, we conclude that the stop was not extended because William's flight preempted any investigation by Carter.

Standard of Review

{¶ 10} "Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *State v. Burnside*, 2003-Ohio-5372, ¶ 8, citing *State v. Mills*, 62 Ohio St.3d 357, 366 (1992). "An appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *State v. Hawkins*, 2019-Ohio-4210, ¶ 16. "Accepting those facts as true, the appellate court must then independently determine, as a

5

matter of law and without deference to the trial court's legal conclusion, whether the applicable legal standard is satisfied." *State v. Isaac*, 2005-Ohio-3733, ¶ 8 (2d Dist.), citing *State v. Retherford*, 93 Ohio App.3d 586 (2d Dist. 1994). "The application of the law to the trial court's findings of fact is subject to a de novo standard of review." *State v. Turner*, 2015-Ohio-4612, ¶ 10 (2d Dist.).

Analysis

**{¶ 11}** The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures. *Terry v. Ohio*, 392 U.S. 1 (1968). "Warrantless searches and seizures violate this prohibition unless conducted pursuant to one of 'few specifically established and well-delineated exceptions.'" *State v. Mee*, 2017-Ohio-7343, ¶ 12 (2d Dist.), quoting *Katz v. United States*, 389 U.S. 347, 357 (1967). One such exception "'is commonly known as an investigative or *Terry* stop,' which includes the temporary detention of motorists for the enforcement of traffic laws." *Id.*, quoting *State v. Dorsey*, 2005-Ohio-2334, ¶ 17 (10th Dist.).

**{¶ 12}** "Though not necessarily requiring a warrant, the temporary 'detention of [persons] during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a "seizure" of "persons" within the meaning' of the Fourth Amendment." (Citations omitted.) *Mee* at ¶ 13, quoting *Whren v. United States*, 517 U.S. 806, 809-810 (1996). "An 'automobile stop is thus subject to the constitutional imperative that it not be "unreasonable" under the circumstances.'" *Id.*, quoting *Whren* at 810. "Generally, a police officer's decision to stop an automobile will comport with this requirement if the officer has a 'reasonable suspicion' of criminal activity." *Id.*

**{¶ 13}** A "seizure justified only by a police-observed traffic violation, therefore, 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e]

6

mission' of issuing a ticket for the violation." *Rodriguez v. United States*, 575 U.S. 348, 350 (2015), quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). Beyond determining whether to issue a traffic ticket, an officer's mission during a traffic stop typically includes "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id* at 355. "These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly. *Id*. "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* at 354.

{¶ 14} Ohio law permits a police officer to order a motorist to step out of a vehicle during a lawful traffic stop without requiring any additional constitutional "quantum of suspicion." *State v. Evans*, 67 Ohio St.3d 405, 408 (1993). This authority, derived from *Pennsylvania v. Mimms,* 434 U.S. 106 (1977), is considered a minimal intrusion that is justified by officer safety concerns. *State v. Lozada*, 92 Ohio St.3d 74, 81 (2001). "However, taking the additional step of placing a driver in a patrol car during a routine traffic stop—and the pat-down search that would normally precede such a step—increases the intrusive nature of the detention and must be justified by reasons beyond those that necessitated the traffic stop." *State v. McCaulley*, 2005-Ohio-2864, ¶ 11(2d Dist.), citing *Lozada* at 79. "Such a step may be justified if it protects the officers or the driver from a dangerous condition during the traffic stop" or "if the officer has a reasonable, articulable belief that an individual is armed and/or dangerous or is engaged in criminal activity." (Citations omitted.) *Id.* "An officer's convenience, however, will not justify placing a driver in the rear of a cruiser." *Id.*, citing *Lozada* at 76. While "the failure to produce a driver's license during a traffic stop is a lawful reason for detaining a driver in a patrol car, an officer . . . may not place a driver in his

7

cruiser as a matter of course while he runs the license information through the computer." *Id*, citing *Lozada* at 77, 79.

{¶ 15} "If, however, the officer 'ascertained reasonably articulable facts giving rise to a suspicion of criminal activity, the officer may then further detain and implement a more in-depth investigation of the individual.'" *State v. Kincaid*, 2024-Ohio-2668, ¶ 18 (4th Dist.), quoting *State v. Robinette*, 80 Ohio St.3d 234, 241 (1997). "The detention of the motorist may last as long as the reasonable suspicion of criminal activity continues." *Id.* The legality of the initial stop, however, "will not support a 'fishing expedition' for evidence of another crime." *Id*., quoting *State v. Venham*, 96 Ohio App.3d 649, 655 (4th Dist. 1994). The officer "'may not expand the investigative scope of the detention beyond that which is reasonably necessary to effectuate the purposes of the initial stop unless any new or expanded investigation is supported by a reasonable, articulable suspicion that some further criminal actively is afoot.'" *State v. Roberts*, 2023-Ohio-2763, ¶ 16 (5th Dist.), quoting *State v. Woodson*, 2008-Ohio-670, ¶ 12 (5th Dist.), quoting *State v. Batchili*, 2007-Ohio-2204, ¶ 34.

{¶ 16} Here, Williams fled the scene before Carter had any opportunity to complete the traffic stop. Carter, working alone and at night, knew that Williams had a criminal history involving both drugs and weapons, a significant cause for concern. The record at least suggests that Williams may have had a history with the police department as well. Contrary to the trial court's conclusion, Carter suspected that Williams and the female passenger were engaged in prostitution based on observable facts and circumstances, namely the location of the vehicle, the tinted windows, and the passenger's limited clothing, as well as Carter's law enforcement experience. In the body camera video, the female passenger is wearing a strapless top, and pants or shorts are not visible on her legs. The record reflects that Carter intended to place Williams in his cruiser for safety reasons and for investigating suspected

8

prostitution—and not merely for checking Williams's license or for the officer's own convenience. Carter was denied the opportunity to do so when Williams fled. In other words, Williams's flight terminated the traffic stop before it was ever extended, and Carter's intentions were preempted when Carter ran. Though the court found that Carter definitively decided not to issue a citation for the parking violation before attempting to escort Williams to his cruiser, Carter's testimony is not clear on that point, as set forth above. Regardless of whether Carter intended to issue a citation or a warning, or neither, however, the stop was not prolonged before Williams fled. Video of the traffic stop supports this conclusion. Williams was patted down near the rear of his car, and he fled as he stepped past his rear bumper, between his car and the cruiser. Four minutes and a few seconds elapsed between the time Carter activated his lights to commence the stop and Williams's flight, and Williams ran less than fifteen seconds after getting out of his car. *See State v. Gurley*, 2015-Ohio-5361, ¶ 24 (4th Dist.) (citing precedent that fifteen and twenty-minute detentions for traffic stops are reasonable). Here, the stop was of much shorter duration due solely to Carter's flight. For the foregoing reasons, the State's assignment error is sustained.

## Conclusion

{¶ 17} Having sustained the State's assignment of error, the judgment of the trial court is reversed, and the matter is remanded for further proceedings.

. . . . . . . . . . . . .

LEWIS, P.J., and EPLEY, J., concur.

9